*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

UNPUBLISHED
November 3, 2022

v

No. 356351
Macomb Circuit Court
LC No. 2015-003739-FC

JOSHUA ANTHONY SEDGEMAN,

Defendant-Appellant.

Before: RICK, P.J., and O'BRIEN and PATEL, JJ.

PER CURIAM.

Defendant appeals as of right his convictions, following a jury trial, of armed robbery, MCL 750.529, conspiracy to commit armed robbery, MCL 750.157a; MCL 750.529, and possession of a firearm during the commission of a felony ("felony-firearm"), MCL 750.227b. The trial court sentenced defendant as a third-offense habitual offender, MCL 769.11, to concurrent prison terms of 225 to 600 months each for the armed robbery and conspiracy to commit armed robbery convictions, and a consecutive two-year term of imprisonment for the felony-firearm conviction. We affirm defendant's convictions and sentences, but vacate the portion of the judgment of sentence requiring defendant to pay attorney's fees and remand for further proceedings.

## I. BACKGROUND

Defendant's convictions arise from a robbery on July 21, 2015, in Warren, Michigan. Defendant was originally convicted of the same offenses in December 2016. In a prior appeal, this Court vacated defendant's convictions and sentences and remanded for a new trial because defendant was allowed to represent himself at trial and "the record [did] not support a conclusion that defendant validly waived his Sixth Amendment right to counsel . . . ." *People v Sedgeman*, unpublished per curiam opinion of the Court of Appeals, issued September 11, 2018 (Docket Nos. 336996 & 336997), p 5.

At defendant's second trial, Ronnie Moore and Sean Neumann both testified that they, along with Justin Woodley and defendant, planned to rob someone for money and marijuana. Moore and Neumann both pleaded no contest to armed robbery and conspiracy to commit armed

-1-

robbery and agreed to testify at defendant's trial. According to Moore and Neumann, the four of them lured the victim, a medical marijuana caregiver, to their residence under the pretext of purchasing marijuana.

After the victim arrived at the house, Moore invited her inside. Woodley and defendant confronted her at gunpoint, and the two men then stole the victim's marijuana, money, and vehicle. Moore and Neumann testified that defendant was armed with a handgun and wore a full-face ski mask, and Woodley was armed with a shotgun and wore a half-face ski mask, which was consistent with victim's description of the two men who confronted her. Neumann testified that he too was wearing a ski mask and stood by in the kitchen during the offense. After the offense, the police recovered two ski masks, a half-face ski mask and a full-face ski mask, from Neumann's car. Neumann testified that he allowed Woodley to use the car after Moore had been arrested. Moore identified the two masks as the masks worn by Woodley and defendant during the robbery. Deoxyribonucleic acid (DNA) testing revealed that the DNA found on the half-face ski mask was consistent with Woodley's DNA profile. The full-face ski mask was also tested for DNA, but the sample was too complex to make any comparison because there were many contributors to the DNA sample. Therefore, defendant could neither be included nor excluded as a contributor to the DNA on the full-face ski mask. The defense theory at trial was that defendant did not commit the offense and that Moore and Neumann conspired to testify untruthfully against defendant in order to receive lighter sentences.

The jury found defendant guilty, and this appeal followed.

## II. RIGHT OF CONFRONTATION

Defendant first argues that the trial court violated his constitutional right to confront the witnesses against him by prohibiting him from cross-examining Moore and Neumann regarding the maximum possible prison sentences they faced for their plea-based convictions of armed robbery and conspiracy to commit armed robbery. We disagree.

Whether a defendant was denied his right to confront a witness is a constitutional question that this Court reviews de novo, without deference to the trial court. *People v Jemison*, 505 Mich 352, 360; 952 NW2d 394 (2020).

The federal and state constitutions protect a criminal defendant's right to confront the witnesses against him. US Const, Am VI; Const 1963, art 1, § 20. "A defendant is entitled to have the jury consider any fact that may have influenced the witness' testimony." *People v McGhee*, 268 Mich App 600, 619; 709 NW2d 595 (2005) (quotation marks, citations, and alteration omitted). In general, however, a jury should not be informed of a possible punishment for conviction. *People v Allan*, 299 Mich App 205, 220; 829 NW2d 319, (2013), overruled in part on other grounds by *People v Cain*, 498 Mich 108, citing *People v Mumford*, 183 Mich App 149, 151; 455 NW2d 51 (1990). "The 'fear' is that such information may cause the jury to 'compromise its integrity and render a verdict based on factors other than the evidence.' " *Mumford*, 183 Mich App at 151 quoting *People v Goad,* 421 Mich 20, 27; 364 NW2d 584 (1984). This prohibition against information about a possible sentence conflicts with the principle that "a limitation on cross-examination which prevents defendant from placing before the jury facts from which bias, prejudice or lack of credibility of a prosecution witness might be inferred constitutes denial of the

constitutional right of confrontation." *Id*. at 153 (quotation marks, citations, and alterations omitted). "Where an accomplice . . . has been granted immunity in order to secure his testimony, it is clear error for the court to deny the defendant the opportunity to elicit this information at trial." *People v Minor*, 213 Mich App 682, 684-685; 541 NW2d 576 (1995). However, "a claim that the denial of cross-examination has prevented the exploration of a witness' bias is subject to harmless error analysis." *Id*. at 688.

Defendant relies primarily on *Mumford*, in which the trial court denied the defendant's motion in limine to permit cross-examination of a prosecution witness, the defendant's former codefendant, on the sentencing consideration that the witness received as part of a plea bargain. *Mumford*, 183 Mich App at 150. This Court held that "the trial court abused its discretion when it denied defendant's motion to cross-examine [the witness] on all details of the plea bargain, including the sentencing consideration [the witness] received in return for his testimony." *Id*. at 154. The panel concluded that "[t]he sentencing consideration received in return for testimony is undeniably a fact which is relevant to a witness' credibility, because it is the crux of the plea agreement." *Id*. at 153 (citation, quotation marks, and alteration omitted).

In the instant case, the trial court permitted defense counsel to cross-examine the witnesses regarding their sentencing guidelines and sentences, but not the maximum penalty for the offenses of which they were convicted. Defendant's right of confrontation was not violated. Moore and Neumann both entered pleas to the offenses charged and both received a below-the-guidelines sentence. However, there was no evidence that their sentences were based on a plea agreement or charge reduction by the prosecution.[1] Moreover, defendant was able to effectively cross-examine both Moore and Neumann regarding the details of their pleas, including any sentencing considerations they received for their pleas, without revealing the maximum penalty for the armed robbery and conspiracy to commit armed robbery charges. Both witnesses testified that they pleaded as charged, but received sentences at the lower end of their guidelines range in exchange for their truthful testimony. Neumann admitted that he agreed to testify in order to receive a lighter sentence, and Moore admitted that she was facing a minimum sentence of eight or nine years, but received a minimum sentence of 54 months, which was at the low end of her guidelines range, because of her cooperation.

In sum, the trial court did not err by limiting the cross-examination by refusing to allow defendant to cross-examine the witnesses about the maximum penalty for the offenses of which they were convicted where (1) the witnesses entered pleas to the offenses as charged, which remained subject to the same maximum penalty, (2) there was no evidence of any agreement related to the maximum sentence, and (3) defendant was otherwise permitted to cross-examine both Moore and Neumann regarding any sentencing considerations they received in exchange for their pleas to show their potential bias or interest in testifying against defendant. *Id*. at 154.

---

[1] The docket entries on which defendant relies merely indicate that Moore and Neumann pleaded no contest to armed robbery and conspiracy to commit armed robbery pursuant to an agreement with the trial court under *People v Cobbs*, 443 Mich 276; 505 NW2d 208 (1993), whereby the court agreed to impose a minimum sentence of 54 months. There is no indication of any agreement related to the maximum sentence.

## III. FAILURE TO REQUEST JURY INSTRUCTIONS

Defendant next argues that defense counsel was ineffective for not requesting jury instructions in accordance with M Crim JI 5.4 (Witness as Undisputed Accomplice), M Crim JI 5.6 (Cautionary Instruction Regarding Accomplice Testimony), M Crim JI 5.13 (Agreement for Testimony), and M Crim JI 5.1 (Impeachment by Prior Conviction) with respect to Moore's and Neumann's testimony. Defendant raised this issue in a motion for a new trial, which the trial court denied. But because the trial court did not hold a *Ginther*[2] hearing, our review of this issue is limited to mistakes apparent on the record. *People v Payne*, 285 Mich App 181, 188; 774 NW2d 714 (2009).

"The denial of effective assistance of counsel is a mixed question of fact and constitutional law, which are reviewed, respectively, for clear error and de novo." *People v Schrauben*, 314 Mich App 181, 189; 886 NW2d 173 (2016) (quotation marks and citation omitted). To establish ineffective assistance of counsel, a defendant must show "(1) that trial counsel's performance was objectively deficient, and (2) that the deficiencies prejudiced the defendant." *People v Randolph*, 502 Mich 1, 9; 917 NW2d 249 (2018). "In examining whether defense counsel's performance fell below an objective standard of reasonableness, a defendant must overcome the strong presumption that counsel's performance was born from a sound trial strategy." *People v Trakhtenberg*, 493 Mich 38, 52; 826 NW2d 136 (2012). "Prejudice" means "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Randolph*, 502 Mich at 9 (quotation marks and citation omitted).

M Crim JI 5.4 addresses a witness's status as an undisputed accomplice. The use note states that M Crim JI 5.4 should be followed by M Crim JI 5.6, and that "[t]his charge should be given automatically where the witness has admitted his guilt or has been convicted of the crime, or where the evidence clearly indicates his complicity." M Crim JI 5.6 essentially informs the jury that it should be cautious in accepting the accomplice-witness's testimony, because the witness may not be credible due to their involvement in the case and potential benefits promised to them in return for testifying.

Although M Crim J1 5.4 and M Crim J1 5.64 were potentially applicable, defendant has not overcome the presumption that defense counsel declined to request those instructions as a matter of trial strategy. Defense counsel never referred to Moore or Neumann as accomplices. Defendant's theory at trial was that he did not participate in the crime, and that Moore and Neumann conspired to implicate him so that they could receive lesser sentences. A request for an accomplice instruction would have been logically inconsistent with the defense theory that defendant was not involved in the offense because a defendant cannot have an accomplice to a crime that he purportedly did not commit. Moreover, although M Crim JI 5.6 would have advised the jury to examine an accomplice's testimony carefully and consider it with caution, it also would have advised the jury to consider whether the accomplice's testimony "is supported by other evidence, because then it may be more reliable." The accounts of Moore and Neumann were

---

[2] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

largely consistent, and were consistent with other evidence introduced at trial. Counsel may have decided to forgo requesting the accomplice testimony instruction because, although it would have advised the jury to view the testimony with caution, it could also have provided a basis for the jury to find Moore's and Neumann's testimony reliable because of the presence of other corroborating evidence.

Even though defense counsel did not request a cautionary instruction on accomplice testimony, he fully explored the credibility issues with Moore's and Neumann's testimony by cross-examining them regarding the sentencing considerations they received in exchange for their cooperation and agreement to testify against defendant, emphasizing that each received lighter sentences in exchange for their cooperation. Counsel also elicited from Moore that she had twice previously been convicted of retail fraud, and elicited her admission that she had lied under oath before. Counsel elicited from Neumann that he has two prior convictions for second-degree home invasion, and prior convictions for receiving or concealing stolen property and retail fraud. Counsel also elicited Neumann's admission that he once gave a false name to the police. During closing argument, counsel characterized Neumann as a career criminal and a career snitch, and argued that whenever he got into trouble, his fallback position was to throw someone else "under the bus."

Defense counsel further argued that, in addition to Moore and Neumann being convicted of conspiracy to commit armed robbery, they both conspired "to take [defendant's] freedom in exchange so they can have a bit more of theirs back." Referring to Moore and Neumann, counsel asked the jury to consider "who we're dealing with here" and argued that they were not particularly honest persons, pointing out that Moore had a history of shoplifting and Neumann a history of breaking into houses and receiving or concealing stolen property. Counsel argued that the government's witnesses were "professional liars."

Although counsel did not request M Crim JI 5.4 and 5.6, the trial court instructed the jury in accordance with M Crim JI 3.6 (evaluating witness credibility), which advised the jury that there is no fixed set of rules for judging whether to believe a witness, but that it may be helpful to consider various factors, including whether the witness has any bias, prejudice, or personal interest in how the case is decided, whether there have been any promises, threats, suggestions, or other influences that affected how the witness testified, and whether in general the witness has any special reason to tell the truth, or any special reason to lie. Under the circumstances, it was not unreasonable trial strategy for defense counsel to forgo requesting the accomplice testimony instructions and to instead rely on his cross-examination of Moore and Neumann, his closing argument, and the trial court's general jury instructions regarding how to evaluate the credibility of the witnesses, which still allowed the jury to fully consider the credibility problems with Moore's and Neumann's testimony that counsel explored during cross-examination and closing argument.

M Crim J1 5.13 provides:

(1) You have heard testimony that a witness, [name witness], made an agreement with the prosecutor about charges against [him/her] in exchange for [his/her] testimony in this trial. You have also heard evidence that [name witness]

faced a possible penalty of [state maximum possible penalty] as a result of those charges.

> (2) You are to consider this evidence only as it relates to [name witness]'s credibility and as it may tend to show [name witness]'s bias or self-interest.

The use note for this instruction states that it should be used only when the jury has heard evidence of the sentencing advantages of a plea deal, specifically the possible penalty the accomplice faced had he or she not made the plea deal. The purpose of M Crim J1 5.13 is to advise the jury that an agreement about charges against a witness in exchange for the witness's testimony is to be considered only as it relates to the witness's credibility. We agree that counsel could have requested an instruction under M Crim J1 5.13 tailored to this case. However, even without the instruction, defense counsel was able to fully explore Moore and Neuman's plea agreements and argue that the witnesses were not credible. The trial court's general instruction on witness credibility advised the jury to consider whether there have been any promises or other influences that affected how a witness testified when evaluating the witness's credibility. Therefore, defendant has failed to establish that the failure to request this instruction changed the outcome of the trial. Defendant had failed to show a reasonable probability that, but for counsel's failure to request an instruction under M Crim J1 5.13, the result of the proceeding would have been different. *Randolph*, 502 Mich at 9.

Defendant also argues that trial counsel was ineffective for failing to request M Crim JI 5.1 (Impeachment by Prior Conviction), which provides:

> (1) You have heard that one witness, _____, has been convicted of a crime in the past.

> (2) You should judge this witness's testimony the same way you judge the testimony of any other witness. You may consider [his / her] past criminal convictions, along with all the other evidence, when you decide whether you believe [his / her] testimony and how important you think it is.

M Crim JI 5.1 would have been applicable in this case because the defense presented evidence that Moore and Neumann had been convicted of crimes in the past. Although no obvious strategic reason for failing to request this instruction is apparent from the record, defendant cannot establish prejudice. Defense counsel emphasized Moore and Neumann's prior convictions during cross-examination and closing argument. Although M. Crim. JI 5.1 would have specifically advised the jury to consider the prior convictions as part of its credibility assessment, the general instructions regarding witness credibility were broad enough to allow the jury to consider this information. Accordingly, defendant has not established that he was prejudiced by trial counsel's failure to request this instruction. *Randolph*, 502 Mich at 9.

## IV. FAILURE TO CALL A WITNESS

Defendant also argues that defense counsel was ineffective for failing to call Keith Moton as a witness. We disagree.

In support of this argument, defendant presented Moton's affidavit outlining his proposed testimony. Defendant asserts that Moton's testimony would have undermined Moore and Neumann's testimony that defendant had lived in the house with Moore and Neumann and inform the jury that defendant had worked the day of the robbery. In his affidavit, Moton averred that he worked with defendant on the date of the offense, and worked with him again the next day. Moton stated that he picked defendant up from his west-side home and drove him to a house where the two worked from 11:30 a.m. until 7:00 or 7:15 p.m. Moton then drove defendant back to his home at 7:00 or 7:15 p.m. and picked him up the next morning at the same house for another job.

A decision whether to call a witness is presumed to be a matter of trial strategy, and this Court does not substitute its judgment for that of counsel concerning matters of trial strategy. *People v Posey*, 334 Mich App 338, 352; 964 NW2d 862 (2020). Initially, Moton was listed as a witness on defendant's "Amended Notice of Alibi." However, a review of Moton's affidavit reveals that Moton was not actually an alibi witness. Moton dropped defendant off at defendant's home on the west side of Detroit at 7:15 p.m. on the night of the robbery. The robbery did not take place until approximately 10:00 or 10:30 p.m. Moton did not state what time he picked defendant up the next day, but Neumann testified that defendant and Woodley left the Warren home after the robbery and did not return or spend the night.

Defendant argues that Moton's testimony would have rebutted Moore and Neumann's testimony that defendant lived with them at the house in Warren and established that defendant instead lived on the west side. However, defense counsel explored this issue with Moore on cross-examination and impeached her with her prior testimony, in which she initially stated that she lived at the Warren house with Woodley and Neumann, but no one else. At trial, Moore later stated that defendant began staying at the house a week before the robbery, but she was not sure whether he was "living there" or "staying there." She stated, however, that defendant's clothing was there, his mail was there, he brought a bed to the house, and "[h]e was at the house all the time" the week before the robbery. The police found mail addressed to defendant at the Warren house. Neumann testified that he lived at the house for less than one month and started seeing defendant at the house approximately one or two weeks before the robbery. The police also had information showing defendant's connection to an area in Warren just north of Detroit, which was the location where defendant was located.

Considering this evidence, defendant has not overcome the strong presumption that counsel's decision not to call Moton as a witness was sound trial strategy because it would have added little to the evidence that was already introduced at trial. First, Moton's proposed testimony would not have established defendant's whereabouts at the time of the robbery. Second, while his testimony would have shown that Moton dropped defendant off at a house in Detroit approximately three hours before the robbery and picked him up from that same house the next morning, other testimony at trial established that defendant did not stay at the Warren house on the night of the robbery.

Furthermore, defense counsel explored the issue of whether defendant was living at the Warren house in his cross-examination of Moore, and there was also other evidence supporting the testimony that defendant had been staying at the Warren house, such as the mail found and testimony that defendant had previous police contact in Warren and that defendant was found in Warren. Considering the evidence, defendant has not established a reasonable probability that

Moton's proposed testimony would have affected the result of the proceeding. *Randolph*, 502 Mich at 9.

## V. SENTENCING AND EXCESSIVE FINES

Defendant also challenges the imposition of $21,070 for the cost of court-appointed counsel as part of his sentence under MCL 769.1k(b)(iv). Defendant argues that it violated the protection of the Excessive Fines Clauses of the United States and Michigan Constitutions. US Const, Am VIII; Const 1963, art 1, § 16. Defendant requests, and plaintiff has stipulated to, a remand for a hearing on the issue of attorney costs regarding defendant's ability to pay the costs imposed.

Because defendant did not raise this issue at sentencing, in a motion for resentencing, or in a motion to remand filed in this Court, the issue is unpreserved. *People v Anderson*, 322 Mich App 622, 634; 912 NW2d 607 (2018). Therefore, we review defendant's claim for plain error affecting his substantial rights. *People v Carines*, 460 Mich 750, 763-764; 597 NW2d 130 (1999). To establish entitlement to relief under plain-error review, the defendant "must show that there was an error, that the error was clear or obvious, and that the error affected his substantial rights." *Posey*, 334 Mich App at 346. "An error affects substantial rights when it impacts the outcome of the lower-court proceedings." *Id*. at 346-347.

The trial court must have the statutory authority to assess costs, fines, or fees against a defendant. *People v Lloyd*, 284 Mich App 703, 707; 774 NW2d 347 (2009). MCL 769.1k and MCL 769.1*l* authorize trial courts "to both impose a fee for a court-appointed attorney as part of a defendant's sentence and to enforce that imposition against an imprisoned defendant." *People v Jackson*, 483 Mich 271, 283; 769 NW2d 630 (2009). MCL 769.1k provides, in relevant part:

> (1) If a defendant enters a plea of guilty or nolo contendere or if the court determines after a hearing or trial that the defendant is guilty, both of the following apply at the time of the sentencing or at the time entry of judgment of guilt is deferred by statute or sentencing is delayed by statute:
>
> \* \* \*
>
> (b) The court may impose any or all of the following:
>
> \* \* \*
>
> (iii) Until October 1, 2022, any cost reasonably related to the actual costs incurred by the trial court without separately calculating those costs involved in the particular case, including, but not limited to, the following:
>
> (A) Salaries and benefits for relevant court personnel.
>
> (B) Goods and services necessary for the operation of the court.
>
> (C) Necessary expenses for the operation and maintenance of court buildings and facilities.

(iv) The expenses of providing legal assistance to the defendant.

In *People v Lewis*, 503 Mich 162, 163; 926 NW2d 796 (2018), the Michigan Supreme Court addressed whether a sentencing court could impose attorney's fees under MCL 769.1k(1)(b)(iv) "without first making findings of fact in support of that amount." The Lewis Court held that "the trial court was required to determine the cost of providing legal assistance to [the] defendant pursuant to MCL 769.1k(1)(b)(iv)." *Id*. at 168.

In this case, the trial court did not make any findings regarding the cost of legal representation provided to defendant. Although the trial court had the authority to assess attorney's fees at sentencing under MCL 769.1k(1)(b)(iv), it was required to make findings regarding the costs of providing legal assistance to defendant, which may include the circumstances of the case and the nature and number of the criminal charges. See *id*. at 167-168. It is likewise unclear whether the trial court considered that defendant's attorney fees may have already been satisfied under the Michigan Indigent Defense Commission Act (MIDCA), MCL 780.981, *et seq.*[3] Therefore, the trial court erred by assessing $21,070 in attorney's fees without first making the

---

[3] The MIDCA was originally enacted by the legislature in 2013. 2013 PA 93. The legislature has amended the MIDCA several times. The MIDCA establishes the Michigan Indigent Defense Commission (MIDC) whose multi-fold purposes include establishing minimum standards on the delivery of indigent criminal defense services "to ensure the provision of indigent criminal defense services that meet constitutional requirements for effective assistance of counsel." MCL 780.985 (3). The act requires the "indigent criminal defense system," which may include trial courts, to make an initial inquiry of indigency of a criminal defendant at their first court appearance and may be reviewed at subsequent stages of the proceeding. MCL 780.983(h); MCL 780.991(3)(a). Factors to consider in determining indigency include income from employment or other sources, whether the defendant receives public assistance, whether the defendant owns property or other economic interests, whether the defendant has outstanding financial obligations, whether the defendant has dependents and their ages, and any employment or job training history. MCL 780.991(3)(a). The statute requires the MIDC to develop standards for indigent criminal defense systems to determine whether a defendant is completely or partially indigent. MCL 780.991(3)(f). If a determination is made that a defendant is partially indigent, it is the obligation of the indigent criminal defense system, with the assistance of the trial court to "determine the amount of money the defendant must contribute to his or her defense." MCL 780.991(3)(a). While not explicit, it should be obvious that reading the MIDCA *in pari materia* with MCL 769.1k(1)(b)(iv), as we are required to do, see *People v Mazur*, 497 Mich 302, 313; 872 NW2d 201 (2015) (under the doctrine of *in pari materia,* "statutes that relate to the same subject or that share a common purpose should, if possible, be read together to create a harmonious body of law"), that when an indigent criminal defense system determines a litigant is totally indigent, neither the system nor the trial court ought to include an assessment of attorney's fees. The trial court and funding unit are already reimbursed for those fees under the MIDCA. See MCL 780.993.

proper findings regarding the cost of legal assistance provided to defendant. See *id.* This was plain error that affected defendant's substantial rights. *Carines*, 460 Mich at 763.

Additionally, defendant requests that this Court instruct to the trial court to consider his ability to pay before imposing the cost for a court-appointed attorney.

> *[W]henever* a trial court attempts to enforce its imposition of a fee for a court-appointed attorney under MCL 769.1k, the defendant must be advised of this enforcement action and be given an opportunity to contest the enforcement on the basis of his indigency. Thus, trial courts should not entertain defendants' ability-to-pay-based challenges to the imposition of fees until enforcement of that imposition has begun. [*Jackson*, 483 Mich at 292.]

Defendant is entitled to an opportunity to contest the trial court's imposition of a fee for his court-appointed attorney, but only after he makes "a timely challenge in the trial court." *Id.* Therefore, our caselaw does not require the court to consider defendant's ability to pay until "that imposition is enforced and the defendant contests his ability to pay." *Id.* at 298.[4] Nonetheless, as discussed, we must remand so that the trial court may "support its findings regarding the cost of legal assistance provided to defendant." *Lewis*, 503 Mich at 168.

## VI. DEFENDANT'S STANDARD 4 BRIEF

Defendant raises two additional issues in a pro se supplemental brief, filed pursuant to Supreme Court Administrative Order No. 2004-6, Standard 4. We reject these two additional claims of error.

## A. DEFENDANT'S HABITUAL-OFFENDER STATUS

Defendant argues that he was improperly sentenced as a third-offense habitual offender because the prosecution failed to file a habitual-offender notice. The record does not support this argument.

Because defendant did not raise this issue at sentencing, in a motion for resentencing, or in a motion to remand filed in this Court, the issue is unpreserved. *Anderson*, 322 Mich App at 634. Therefore, we review this issue for plain error affecting defendant's substantial rights. *Carines*, 460 Mich at 763-764. To establish entitlement to relief under plain-error review, the defendant "must show that there was an error, that the error was clear or obvious, and that the error affected his substantial rights." *Posey*, 334 Mich App at 346. "An error affects substantial rights when it impacts the outcome of the lower-court proceedings." *Id.* at 346-347.

MCL 769.13 provides, in relevant part:

---

[4] We recognize the concerns regarding the imposition of fees and costs without a court first conducting an ability-to-pay analysis—particularly for those who are indigent. See i.e., *People v Cameron*, 504 Mich 927, 928 (2019) (MCCORMACK, C.J., concurring).

(1) In a criminal action, the prosecuting attorney may seek to enhance the sentence of the defendant as provided under section 10, 11, or 121 of this chapter, by filing a written notice of his or her intent to do so within 21 days after the defendant's arraignment on the information charging the underlying offense or, if arraignment is waived, within 21 days after the filing of the information charging the underlying offense.

(2) A notice of intent to seek an enhanced sentence filed under subsection (1) shall list the prior conviction or convictions that will or may be relied upon for purposes of sentence enhancement. The notice shall be filed with the court and served upon the defendant or his or her attorney within the time provided in subsection (1). The notice may be personally served upon the defendant or his or her attorney at the arraignment on the information charging the underlying offense, or may be served in the manner provided by law or court rule for service of written pleadings. The prosecuting attorney shall file a written proof of service with the clerk of the court.

Likewise, MCR 6.112(F) provides:

A notice of intent to seek an enhanced sentence pursuant to MCL 769.13 must list the prior convictions that may be relied upon for purposes of sentence enhancement. The notice must be filed within 21 days after the defendant's arraignment on the information charging the underlying offense or, if arraignment is waived or eliminated as allowed under MCR 6.113(E), within 21 days after the filing of the information charging the underlying offense.

"The purpose of the notice requirement is to provide the accused with notice, at an early stage in the proceedings, of the potential consequences should the accused be convicted of the underlying offense." *People v Head*, 323 Mich App 526, 543; 917 NW2d 752 (2018) (quotation marks and citation omitted). Failure to file a proof of service of the notice of intent to enhance the defendant's sentence may be harmless if the defendant received the notice of the prosecutor's intent to seek an enhanced sentence and the defendant was not prejudiced in his ability to respond to the habitual-offender notification. *Id*. at *543*-544.

The record indicates that the prosecution filed a fourth-offense habitual-offender notice on October 26, 2015, which was the same day defendant waived arraignment and was provided with a copy of the information. The record does not indicate that the prosecution filed a written proof of service pursuant to MCL 769.13(2). However, because the record indicates that defendant had actual notice of the prosecution's intent to seek an enhanced sentence and defendant was not prejudiced in his ability to respond to the habitual-offender notification, any error was harmless. *Head*, 323 Mich App at 544.

At defendant's first sentencing in 2017, defendant complained that a habitual-offender notice was not filed, but defense counsel correctly noted that the notice was filed on October 26, 2015. Thereafter, the parties discussed defendant's prior felony convictions, and the effect of those convictions on defendant's sentencing guidelines and sentencing overall.

At defendant's second sentencing on February 11, 2021, defense counsel and the prosecution informed the trial court that the prosecution had agreed to reduce the habitual-fourth status to a habitual third to avoid a 25-year mandatory minimum sentence and give the trial court more discretion to sentence defendant within the guidelines. The court agreed to allow the amendment from a habitual-fourth notice to a habitual third. Considering this evidence, it is clear that defendant had actual notice of the prosecutor's intent to seek an enhanced sentence and was not prejudiced in his ability to respond to the habitual-offender notification because counsel at both sentencings acknowledged defendant's habitual-offender status and thoroughly discussed defendant's prior felonies. Furthermore, defendant has not established any prejudice as a result of the prosecution's failure to file an amended habitual-offender notice after sentencing. The judgment of sentence clearly indicates that defendant was sentenced as a third-offense habitual offender in accordance with the parties' agreement at sentencing. Defendant is not entitled to resentencing on this basis.

## B. FAILURE TO APPOINT A DNA EXPERT

Defendant argues that the trial court erred by denying his postjudgment motion for appointment of a DNA expert in order to analyze the two ski masks recovered by the police, and an airsoft gun that was found inside the house in Warren. We disagree.

An indigent defendant's request for state funds to pay for an expert is analyzed under the due-process framework set forth in *Ake v Oklahoma*, 470 U S 68; 105 S Ct 1087; 84 L Ed 2d 53 (1985). *People v Kennedy*, 502 Mich 206, 218-220; 917 NW2d 355 (2018). When presented with an indigent defendant's request for funding for an expert, due process requires that the trial court weigh the following factors:

> (1) "the private interest that will be affected by the action of the State," (2) "the governmental interest that will be affected if the safeguard is to be provided," and (3) "the probable value of the additional or substitute procedural safeguards that are sought, and the risk of an erroneous deprivation of the affected interest if those safeguards are not provided." [*Id*. at 215, quoting *Ake*, 470 US at 77.]

See also *Matthews v Eldridge*, 424 U S 319, 335; 96 S Ct 893; 47 L Ed 2d 18 (1976).

Because the first two factors generally converge in a criminal case, the third factor will determine whether a defendant is entitled to funds for an expert. See *Kennedy*, 502 Mich at 215-216. In order to satisfy the third factor, "a defendant must show the trial court that there exists a reasonable probability both that an expert would be of assistance to the defense and that denial of expert assistance would result in a fundamentally unfair trial." *Id.* at 228 (quotation marks and citation omitted).

After the trial court denied defendant's postjudgment oral motion for appointment of a DNA expert, defendant filed a written motion for reconsideration of that decision, arguing that a DNA expert was needed to: (1) retest the ski masks to determine if Neumann's DNA was on either of the masks; and (2) test the airsoft handgun to determine if Neumann's DNA was on the gun. Defendant argued that the DNA results could be used to show that Neumann, not defendant, was the person who was holding the handgun over the victim during the offense.

-12-

At trial, testimony established that two men wearing masks and holding guns confronted the victim, taking her money, keys, and marijuana. Moore and Neumann testified that Woodley and defendant were the two men holding guns and wearing masks. They testified that defendant was the man who wore the full-face mask and held a handgun in the victim's face, and Woodley was the man who wore the half-face mask and was armed with a shotgun. Moore testified that in addition to the two guns that Woodley and defendant carried, there was an airsoft gun in the house that was kept under the couch. Testimony at trial confirmed that an airsoft gun was found under the couch when the officers were executing a search warrant. DNA testing revealed that Woodley's DNA was a 99% match for the male contributor to DNA for the half-face mask. However, the full-face mask was too complex to make any DNA comparisons, likely because the swab was a mixture of too many people to compare with the DNA samples provided.

Defendant has not shown that there exists a reasonable probability that a DNA expert would have been of assistance to the defense or that denial of a DNA expert resulted in a fundamentally unfair trial. The testimony at trial indicated that DNA consistent with Woodley's DNA profile was found on the half-face mask that Moore claimed Woodley wore, and defendant was excluded as a contributor to the DNA on that mask. Because defendant was excluded as a contributor to the DNA on that mask, there was no reasonable probability that further testing of that mask was necessary to assist defendant.

With respect to the full-face mask, defendant hypothesizes that if that mask was retested and found to contain Neumann's DNA, it would exonerate him as the gunman who was armed with the handgun during the offense. However, the testimony at trial indicated that the DNA on that mask was too complex to make any comparison, most likely because of the presence of DNA from many different contributors. The analyst was not able to either include or exclude defendant as a contributor. Moreover, Moore testified at trial that many different people had worn the ski masks over the years. In light of the testimony that the full-face mask had already been analyzed and that the DNA was too complex to make a comparison, there was no reasonable probability that further testing would assist defendant. Further, even assuming that additional testing could be conducted and that such testing could identify DNA consistent with Neumann's DNA profile, considering the evidence that many people had worn that mask and that there was DNA from other contributors, and that defendant could not be excluded as one of those contributors, any evidence that Neumann's DNA was discovered on the face mask would not eliminate defendant as the person who wore that mask during the robbery. Defendant was able to establish at trial that DNA testing could not positively link him to that face mask. Under these circumstances, the denial of an expert did not result in a fundamentally unfair trial.

Finally, because there was never any evidence introduced or argument made that the airsoft gun was one of the weapons used during the robbery, DNA testing of that weapon was not necessary to assist defendant. Moore testified that in addition to the handgun and the shotgun, there was an airsoft BB gun under the couch in the house. Thus, even if the airsoft gun was tested and found to contain Neumann's DNA, because there was never any argument by anyone throughout the trial that the airsoft gun was used during the robbery, that test result would have no probative value in eliminating defendant as the person armed with the handgun during the robbery.

For these reasons, the trial court did not err by denying defendant's postjudgment request for a DNA expert.

We affirm defendant's convictions and sentences, but vacate the portion of the judgment of sentence requiring defendant to pay attorney's fees and remand for further proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Michelle M. Rick
/s/ Colleen A. O'Brien
/s/ Sima G. Patel